UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILBERTO BELARDO, | No. 2:16-cv-0985 AC P |
| Petitioner, | |
| v. | ORDER AND FINDINGS AND RECOMMENDATIONS |
| K. HOLLAND, | |
| Respondent. | |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He filed his petition on May 30, 2014 in the Northern District of California. ECF No. 1. Respondent answered the petition on November 24, 2014 and, on May 9, 2016, the case was transferred to this district. ECF Nos. 13, 18. Petitioner did not file a traverse. For the reasons that follow, the undersigned recommends that the petition be denied on the merits without an evidentiary hearing.

BACKGROUND

The following statement of the case is taken from the unpublished opinion of the California Court of Appeal on direct review:[1]

In February 1998, Zarate lived alone in a small trailer, from which

---

[1] The undersigned has independently reviewed the trial record, and confirms the accuracy of the state court's recitation of the evidence presented at trial.

1

he sold drugs, at the corner of Jackson and Cherry Streets in Dixon, California. Across the street from Zarate's trailer, about 20 to 25 feet away, Charlie Moore lived in a four-unit building. Belardo lived in Dixon with his mother, Norma Rivera; his stepfather; his girlfriend, Ellis; and his 15-year-old half brother, Bango.

On February 15, 1998, Alvaro Delatorre was visiting Zarate, his friend, while Moore hosted a barbecue party across the street. About 9:00 p.m., there was a knock at the door of Zarate's trailer.[2] The visitor gave a name that Delatorre did not remember and Zarate said it was okay to open the door. Delatorre saw a man pointing a revolver at them, accompanied by another man wearing what might have been a nylon stocking over his face. The man with the gun said, "This is a robbery. Give us the money, the jewelry, and the dope." The man then hit Delatorre on the top of his head with the gun, cutting his scalp and leaving him dizzy and dazed. One of the men reached around Delatorre's neck and grabbed jewelry. Delatorre took out his wallet and the gunman took it from his hand.

The gunman repeated his demand for money, dope, and jewelry and Zarate said, "I ain't giving nothing up." Delatorre heard multiple gunshots and saw that Zarate had been hit. After telling Delatorre to keep quiet, the two men left. According to Delatorre, Zarate had methamphetamine and $1,500 on his person before the robbery. When Zarate's body was later examined, the drugs and cash were gone.

Delatorre ran to Moore's house, where the party was still in progress, and reported the incident to the 911 operator. He went back to the trailer and the police arrived a short time later. Zarate was still alive when police arrived, but was unable to communicate. His shirt had been removed and he was bleeding heavily from a bullet wound in the center of the chest. Paramedics removed Zarate from the trailer, but he died at the scene.

When police interviewed him, Delatorre described the gunman as a "Black male around five foot six" with "a muscular build," "round face," and "puffy cheeks and short hair." Delatorre thought the second man was also African-American, based on seeing his hands and arms. During a pretrial conditional examination, held in anticipation of Delatorre's imminent deportation, he described the gunman as clean shaven, with no acne on his face, no visible tattoos,[3] and wearing a tank top. He told the police that the revolver was chrome colored.

Search of the trailer revealed a bloody shirt with a bullet hole on the bed with a spent bullet underneath it. A ballistics expert testified

[2] [Fn. 5 in original excerpted text]. Delatorre testified that the knock came at 8:00 p.m. or shortly thereafter. Other witnesses, however, placed the subsequent events at or after 9:00 p.m.

[3] [Fn. 6 in original excerpted text]. Belardo's sister testified for the defense that Belardo had gang tattoos between his fingers and on the back of his arm before February 15, 1998; Delatorre testified that he did not see the back of the gunman's arms and was not looking for tattoos when the man held the gun to his head.

2

that the bullet was .38 caliber, typically fired from a .38 special ammunition revolver. No spent casings were found.

Zarate had a bullet entry wound in the chest and an exit wound in his back. He also had separate entry and exit wounds in his left arm. At trial, Delatorre testified that the gunman looked like one of two persons he had seen watching him and Zarate from Moore's party that night. He said that he had seen the gunman "driving around" in a black convertible Mustang about a week before the shooting. The People also presented testimony from a number of witnesses indicating that Belardo's stepbrother, Greg Felix,[4] drove a Mustang convertible and that Belardo rode in the car with Felix.[5]

When Delatorre testified at the conditional hearing, he identified Belardo as the gunman, but he was "not a hundred percent sure." Belardo was wearing "jail clothes" and was in shackles at that hearing. At trial, Delatorre again identified Belardo as one of the two men who entered Zarate's trailer. He was about 50 percent sure.

However, on the night of the homicide, Delatorre assisted in the preparation of a computer-generated composite of the suspect.[6] As the investigation progressed, he viewed several photographic lineups that included Belardo, but he told the police that he did not recognize anyone as the assailant. On February 23, Delatorre viewed a live lineup including Belardo, but did not identify him. The investigators told Delatorre that the shooter was in the live lineup, and when he said he did not recognize anyone, they told him, "Yes, he is. He's there. Pick him out." Delatorre felt he was being pushed into picking somebody. He then selected someone other than Belardo from the live lineup and told the investigators he was 90 percent sure.

Belardo was on parole from the California Youth Authority on February 15, 1998, and was subject to electronic monitoring, with a curfew of 10:00 p.m. He subsequently admitted a parole violation because electronic monitoring showed that he was not in his residence until 10:08 p.m. on February 15, 1998. He told police that he was at Moore's house between 7:00 and 9:00 p.m. and then walked home, a distance of about half a mile.[7] He said that when

---

[4] [Fn. 7 in original excerpted text]. Some witnesses identified Felix as Belardo's "brother." Bango identified Belardo as his "half brother" and Felix as his "stepbrother."

[5] [Fn. 8 in original excerpted text]. When Delatorre was interviewed by the police in 1998 he repeatedly said that he had not seen the gunman before the incident. He said that he had not looked at the people across the street or paid any attention to them. It was only when he was contacted by law enforcement again in 2008 that he mentioned seeing the gunman in a Mustang the week before the shooting.

[6] [Fn. 9 in original excerpted text]. This composite of the shooter was "lost" by the time of trial.

[7] [Fn. 10 in original excerpted text]. On cross examination, the police officer testifying about the distance admitted that it was his best guess, but that it was possible that, if Google Maps indicated a distance of 1.7 miles, that distance might be correct.

3

he got home he played with the dog in the back yard and denied possessing a gun.

The police searched Belardo's residence on February 17, 1998 and found no evidence connecting him to the robbery and homicide.

Belardo, Bango, Felix, and Belardo's long-time friend, Dustin Blaylock, attended Moore's barbecue. They congregated in the carport area, from which Zarate's trailer was visible. Moore's girlfriend, Lea Mitchell, testified that at some point she overheard a conversation about "jacking" someone. She did not know who made the statement.

Bango was in the carport watching Belardo and Blaylock play craps when Belardo showed Bango a .38 revolver, which he held under a towel. Bango asked why he had a gun, and Belardo responded, "In case something happens. In case something pops off." Later that afternoon, Belardo asked Bango to hold the gun and then left the carport. Belardo returned within five minutes and took the gun back. Bango never saw the gun again and he left the party about 5:00 p.m. to meet friends.

In the evening, Belardo and Blaylock left the party and a short time later, Mitchell heard gunshots. She did not see Belardo or Blaylock again that night.

At the time of the homicide, Francisco Garcia lived next door to Blaylock and .46 miles from Zarate's trailer. About 9:00 p.m., Garcia heard sirens and saw police cars going by. Blaylock then came to Garcia's house with "a Black guy" named "Willie"[8] and asked to use the telephone. Garcia testified that he knew Willie's brother, Felix, and he had seen Willie driving around in Felix's car.[9] Blaylock and Willie appeared exhausted, as if they had been running. Willie left a short time later, but Garcia did not know how long Blaylock stayed.[10]

Bango returned to Moore's party that evening with Ellis and a friend, and, on arrival, encountered Delatorre, bleeding and seeking help. After taking Delatorre to Moore's residence to call the police, Bango and Ellis returned to Bango's house.[11]

---

[8] [Fn. 11 in original excerpted text]. Belardo was known as "Willie."

[9] [Fn. 12 in original excerpted text]. On cross-examination, Garcia said that he did not "know" the man he referred to as "Willie." Garcia failed to identify Belardo in a pretrial photo lineup in 2009, selecting another photograph, but saying he was "not sure."

[10] [Fn. 13 in original excerpted text]. Garcia admitted lying to police when he told them in 1998 that Blaylock had stayed at his house the entire night.

[11] [Fn. 14 in original excerpted text]. Bango's account of meeting Delatorre in the street was not corroborated by other witnesses. Delatorre did not mention it. Ellis testified that when they arrived at Moore's, the road was blocked off and they saw police officers, so they went back home.

When they arrived home, Belardo and Rivera were there. Bango asked whether Belardo had anything to do with the shooting. Belardo appeared agitated and told him to "Shut up." Bango asked Belardo several times whether he was involved and Belardo responded by making threats. He said, "I did it once. What makes you think I won't do it again?" Bango understood that Belardo would kill him if he talked to anybody about the incident. Belardo told him, "I'll beat the 'F' out of you" and "Don't say anything. You are trying to get me 25 to life."

Bango testified that Belardo suggested he take responsibility for the shooting, telling him that because he was a minor his punishment would be relatively light.[12] Belardo told Bango that he should expect to be questioned by the police and that Bango needed to corroborate his alibi about being in the backyard playing with the dog.

Ellis had moved in with Belardo about a month before the Zarate homicide. She testified that Belardo sold drugs and that, on his behalf, she sold drugs at school. About a week before the homicide, Ellis overheard Belardo in a telephone conversation "about the guy in the trailer that sold drugs." Belardo said he was "considering robbing" the man. She did not know with whom Belardo was speaking.

On the night of the homicide, when she and Bango returned home after trying to go to Moore's party, Belardo was home, shaving, and "shaking and scared." They started talking about the shooting. Ellis said that Belardo wanted Bango to confess to the shooting, saying he was only 15 years old and would not "do very much time."

Belardo told Ellis "he didn't go there to do that. He went there to rob him and ended up shooting a guy; probably took a guy's life. It wasn't worth very much. They didn't even get very much money out of it." Belardo said that Blaylock was with him.

Ellis was scared because she was dating Belardo and living in his house. Belardo and Ellis began taking measures to "stay out of the view." They hid in a crawl space in Rivera's closet and Belardo would hide in the trunk of their vehicle as they were driving. Belardo told Ellis that, when questioned by the police, she should say that he was in the back yard that night playing with the dogs because the back yard was far enough from the house to set off his ankle monitor.

Ellis testified that a day or two after the shooting, Rivera asked Ellis to accompany her and they drove to Lake Berryessa. Rivera handed Ellis a revolver, which she recognized as belonging to Belardo, and she threw it into the water from the edge of a cliff.[13]

---

[12] [Fn. 15 in original excerpted text]. Bango did not tell investigators that Belardo suggested he take responsibility until 2008.

[13] [Fn. 16 in original excerpted text]. Ellis did not tell investigators about throwing the gun into

After Ellis disposed of the gun, Belardo told her he would harm her or her family if she "confessed."

Ellis later married Belardo. They moved first to Florida and then to Tennessee, where Belardo continued to threaten her, saying that with what she knew about the shooting, she "could really put him in jail for a long time, so he said it was all on me." He told her that no one would ever find her body, and her family would not know that she was gone. On one occasion he held a gun to her head and beat her severely. Ellis eventually left Belardo and had no contact with him after 2002.

In 2009, Belardo was incarcerated in Tennessee and was disciplined for adding some dreadlocks to his short hair. James Russell, an employee at the Tennessee correctional facility, testified that Belardo told him he was facing a murder charge in California and "he wanted to change how he looked."

People v. Belardo, No. A133128, 2013 Cal. App. Unpub. LEXIS 7940, 2013 WL 5845121, *1-5 (Cal. Ct. App. Oct. 31, 2013) (unpublished).

I.      Procedural Background

    A.  Trial Court Proceedings

On May 10, 2010, the Solano County District Attorney filed an amended information charging petitioner with murder during the commission of robbery pursuant to California Penal Code §§ 187(a)/190.2(a)(17) (count 1) and assault with a firearm pursuant to California Penal Code § 245(a)(2) (count 2). 1 CT 275-76.[14] The information alleged that in connection with count 1, petitioner personally discharged a firearm causing death pursuant to California Penal Code §§ 12022.5(a)(1) & 12022.53(b)) and that he committed the murder while engaged in robbery pursuant to California Penal Code § 190.2(a)(17). Id. The information alleged in connection with count 2 that he personally used a firearm within the meaning of California Penal Code § 12022.5. Id.

On January 18, 2011, count 2 was dismissed with the prosecutor's concurrence. 2 CT 359. On April 20, 2011, the parties waived a jury trial, and petitioner agreed to proceed by way

Lake Berryessa until 2008. The investigators then searched the area of the lake, and surrounding dry bank, specified by Ellis, but did not find the firearm.

[14] "CT" refers to the three-volume Clerk's Transcript on Appeal, which has been lodged with this court.

of court trial.  2 CT 433.  On May 12, 2011, the trial court convicted petitioner of first degree

murder and found true the enhancements and special circumstances allegation.  3 CT 620.

On August 18, 2011, the trial court denied the motion for a new trial and sentenced

petitioner to life in prison without the possibility of parole and to a term of 25 years to life for the

personal discharge of a firearm causing death.  3 CT 708-712.  The trial court stayed sentence on

the remaining enhancements.  Id.

B.  Direct Appeal

On August 24, 2011, petitioner appealed the judgment to the California Court of Appeal.

3 CT 715-717.  On October 31, 2013, the California Court of Appeal affirmed the conviction.

Belardo, 2013 WL 5845121, *15; Resp't Ex. C.

On December 9, 2103, petitioner filed a petition for review in the California Supreme

Court.  Resp't Ex. D.  On February 11, 2014, the California Supreme Court denied the petition for

review.  Resp't Ex. E.

C.  Federal Habeas Proceedings

On May 30, 2014, petitioner filed the instant petition in the federal district court for the

Northern District of California.  ECF No. 1.  Respondent filed an Answer.  ECF No. 13.

Although given the opportunity to do so, petitioner did not file a Traverse.  The petition was

transferred to this court on May 9, 2016.  The matter is fully briefed and ripe for adjudication.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a state court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

7

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 131 S. Ct. 770, 785 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. at 784-785 (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 1399. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily,

8

1   without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court

2   denies a claim on the merits but without a reasoned opinion, the federal habeas court must

3   determine what arguments or theories may have supported the state court's decision, and subject

4   those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

5                                   DISCUSSION

6          Petitioner asserts the following claims: (1) the trial court failed to obtain a separate waiver

7   of trial by jury on the special circumstance allegation, which would determine whether or not he

8   could ever be eligible for parole; (2) the trial court should not have admitted the testimony of Ellis

9   and Bango, because such testimony was uncorroborated and the witnesses were liable for

10  prosecution of the murder of Zarate; (3) material exculpatory evidence was not provided to

11  petitioner before trial, depriving him of due process under Brady v. Maryland, 373 U.S. 83

12  (1963); (4) because petitioner was brought to trial in 2011 for a crime that occurred in 1998, he

13  was prejudiced by the delay in prosecution; (5) the trial court erred in denying a mistrial because

14  of the Brady violation; (6) because of the alleged Brady violation, petitioner's waiver of trial by

15  jury on the issue of guilt was neither knowing nor intelligent; and (7) the trial court erred in

16  denying petitioner a new trial because of new evidence discovered after trial.  ECF No. 1 at 14-

17  78. [15]

18      I.    Claim One: Waiver of Right to Trial by Jury on Special Circumstance Allegation

19              A.  Petitioner's Allegations and Pertinent Record

20          Petitioner alleges that the failure to obtain a separate express and personal waiver of his

21  right to a jury trial on the special circumstances allegation violated his Sixth Amendment rights.

22  ECF No. 1 at 14-20.

23          The state appellate court provided the following factual background for this claim:

24                  On April 20, 2011, prior to the commencement of jury selection,
                Belardo's counsel stated that Belardo was prepared to waive trial by
25              jury.  The court gave the People time to consider waiving jury trial
                and, after a recess, the People stated their willingness to waive as
26

27  [15]  Page number citations refer to those assigned by the Court's electronic case management filing
    system and not those assigned by Petitioner.

28

                                        9

well. The court instructed Belardo's counsel to conduct a voir dire of Belardo, which proceeded as follows: "[Y]ou have a right to have a jury trial, a jury of 12 people, listen to this case. By waiving that right, that means that you will not have a jury trial, that the person who is going to be judging the facts and credibility of the case will be the judge alone. [¶] You have a right to have the jury trial. [¶] Are you willing to waive it?" Belardo answered in the affirmative and his counsel announced, "Defense waives." The court asked Belardo, "You understand, when you say, 'you waive,' that means you are giving up that right?" Belardo answered, "Yes, sir." The court then asked, "And I'm the one that makes the decision, guilty or not guilty. Do you understand that?" Belardo again answered, "Yes, sir." Finally, the court asked, "And you're prepared to give up that right and have me do that?" Again, Belardo answered, "Yes, sir." The court then accepted the jury waiver.

Belardo, 2013 WL 5845121, *6.

B. The Clearly Established Federal Law

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The "statutory maximum" for Apprendi purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings. Blakely v. Washington, 542 U.S. 296, 303-04 (2004).

More recently, the Supreme Court has held that this requirement applies to findings which increase the mandatory minimum. In Alleyne v. United States, the majority wrote:

Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an "element" that must be submitted to the jury.

133 S. Ct. 2151, 2155 (2013).

The right to a jury trial is waivable, as long as the waiver includes the consent of the government counsel, the sanction of the court, and the "express and intelligent consent of the

10

1  defendant." <u>Patton v. United States</u>, 281 U.S. 276, 312 (1930), <u>modified on other grounds by</u>

2  <u>Williams v. Florida</u>, 399 U.S. 78, 92 (1970).

3          C.  <u>The State Court's Ruling</u>

4      Petitioner raised this claim on direct appeal.  The California Court of Appeal ruled as

5  follows:

6          Belardo contends that the record does not contain a knowing and
        intelligent waiver of the right to a jury determination of the special
7          circumstance allegation that the murder of Zarate took place during
        commission of a robbery (§ 190.2, subd. (a)(17)(A)). Without such
8          a waiver, he argues, we must reverse the finding on the special
        circumstance and adjust his sentence to life in prison with the
9          possibility of parole.

10         Section 190.4, subdivision (a), expressly provides the procedure for
        reaching findings on special circumstance allegations at bench
11         trials: "If the defendant was convicted by the court sitting without a
        jury, the trier of fact shall be a jury unless a jury is waived by the
12         defendant and by the people, in which case the trier of fact shall be
        the court." Our Supreme Court has construed this provision to mean
13         that "an accused whose special circumstance allegations are to be
        tried by a court must make a separate, personal waiver of the right
14         to a jury trial." (<u>People v. Memro</u> (1985) 38 Cal.3d 658, 704
        (<u>Memro</u>), overruled on other grounds by <u>People v. Gaines</u> (2009)
15         46 Cal.4th 172, 181, fn. 2.) "Assuming an accused desires to waive
        his right to a jury as to both the guilt and special circumstance
16         determinations, the trial court could satisfy section 190.4,
        subdivision (a)'s requirement by taking separate waivers as to each
17         before commencement of trial." (<u>Memro</u>, at p. 704.)

18         In <u>People v. Diaz</u> (1992) 3 Cal.4th 495 (<u>Diaz</u>), the defendant was
        advised: " '[Y]ou'll be giving up that right to have the jury in two
19         different functions. First of all, first function is to decide the
        question of your guilt or innocence. Then the second function,
20         similarly, . . . you would have 12 jurors who must unanimously
        agree as to the punishment . . . . And you'll be giving up that right.' "
21         (<u>Id.</u> at p. 564.) The defendant answered, " 'I'm giving it up' " and
        acknowledged his understanding that the waiver applied "to 'both
22         phases . . . of the special circumstances case.' " (<u>Ibid.</u>) The Diaz
        court explained that under <u>Memro</u>, "a waiver of a defendant's right
23         to have a jury determine the truth or falsity of alleged special
        circumstances may not be accomplished by counsel's stipulation.
24         The waiver must be made by the defendant personally, and must be
        'separate'—that is, if the defendant is to be deemed to have waived
25         the right to jury trial on both guilt and special circumstances, the
        record must show that the defendant is aware that the waiver
26         applies to each of these aspects of trial." (<u>Diaz</u> at p. 565.) Applying
        this rule, the court concluded: "In this case, the trial court explained
27         to defendant that the waiver of his right to trial by jury applied to all
        aspects of his special circumstances case, from beginning to end.
28         Defendant also told the court that he had discussed the matter 'quite

thoroughly' with his counsel. Although the trial court's admonition was not a model of clarity, we believe it was sufficient to advise defendant that his waiver, which included all aspects of guilt and penalty, included within it a waiver of the right to jury trial on the truth or falsity of the special circumstance allegation." (<u>Ibid.</u>)

The defendant in <u>People v. Wrest</u> (1992) 3 Cal.4th 1088 (<u>Wrest</u>) was advised that his right to a jury trial included "'any other special allegations that are charged in this particular case.'" (<u>Id.</u> at p. 1103.) He was also told that if tried by a jury, all 12 jurors would have to agree on the special circumstances. (<u>Ibid.</u>) The defendant then waived his right to a jury trial as to the "'special allegations that we've already talked about '" and agreed that he did not "'want a jury trial on the issue of guilt or the special circumstances.'" (<u>Id.</u> at p. 1104.) The court held that the record "reflects an express and personal understanding and waiver of appellant's right to jury trial on the special circumstance allegations. The mere fact that the prosecutor's questions combined issues of guilt, special circumstances, and enhancements did not vitiate the waiver." (<u>Ibid.</u>) The court explained that <u>Memro</u> "does not require . . . a waiver to be taken in accordance with any particular procedure." (<u>Id.</u> at p. 1105.)

In <u>People v. Weaver</u> (2012) 53 Cal.4th 1056 (<u>Weaver</u>), the Supreme Court again rejected a defendant's contention that <u>Memro</u> required a finding that his waiver of a jury trial was not a waiver of a jury finding on the special circumstance allegation: "In this case, the record demonstrates that defendant's jury waiver included the special circumstance allegations. The written waiver regarding guilt that defendant and his counsel signed did not specifically reference the special circumstance allegations. But in the oral proceedings, the court advised defendant that 'a waiver of jury is a waiver of jury on all of the triable issues before the court.' It explained to defendant twice that these issues included the special circumstance allegations. Additionally, the written waiver as to penalty, which defendant and his counsel also signed, expressed defendant's desire to waive a penalty jury if, at the guilt phase, he was 'found guilty of first degree murder and *a special circumstance is found true*.' . . . Defendant understood and intended his waiver to include both guilt and special circumstances as well as, if it came to that, the penalty determination. To require more, or to mandate a different procedure, would exalt form over substance." (<u>Id.</u> at p. 1075.)

Diaz, Wrest, and Weaver all had records demonstrating that the defendant was aware that his waiver applied both to the issue of guilt and to the issue of the truth of a special circumstance. In each case, during colloquy with the court, the special circumstance aspect was specifically mentioned, or the defendant was informed that his waiver applied to all triable issues and the written waiver noted the special circumstance aspect of the trial. In Belardo's case, no written waiver was executed and in the colloquy with the court, there was no mention of the special circumstance aspect of the charges. Belardo's attorney did obtain Belardo's agreement that "the person who is going to be judging the facts and credibility of the case will be the judge alone," but this does not demonstrate (as

a reference to "all triable issues" might have) that Belardo understood his waiver to apply not only to the issue of guilt, but also to the special circumstance.

We conclude that the record does not demonstrate that Belardo was aware that his waiver applied to both guilt and the special circumstance allegation. The Diaz test is not satisfied and it was error for the court, and not a jury, to make a finding on the special circumstance.

Belardo argues that "[p]rejudice in a failure-of-advisement context is measured by whether the defendant was aware of his constitutional rights." None of the cases he cites for this proposition involves the separate waiver of a right to a jury trial on a special circumstance allegation.[16] Memro made clear that an error in obtaining a separate waiver to a jury trial on a special circumstance allegation does not require automatic reversal—prejudice must be shown: "In this case, the record is clear that the trial court erred in failing to take a personal jury waiver on the multiple murder special circumstance allegation. However, since the judgment must be reversed on other grounds, it is unnecessary to determine whether appellant was prejudiced by that error. The question as to what standard of prejudice should be applied in this situation is left for another day."[17] (Memro, supra, 38 Cal.3d at pp. 704–705, fn. omitted.)

Here, the evidence that Zarate was shot during the course of, at a minimum, an attempted robbery, was uncontroverted. Defense counsel argued that there was no evidence that the two assailants took anything. However, Delatorre testified without equivocation that the gunman told Zarate, "This is a robbery. Give us the money, the jewelry, and the dope." Delatorre also stated that his wallet was taken, but even if the robbery had not been completed, there was no question that the victim was shot during an attempt to rob him and Zarate. Moreover, Ellis testified that before the homicide, Belardo discussed robbing "the guy in the trailer" in a telephone conversation, and after the homicide he told her that "[h]e went there to rob him."

The error in failing to obtain a separate waiver on the special circumstance allegation from Belardo was harmless under any standard of prejudice. Once having determined that Belardo

---

[16]  [Fn. 17 in original excerpted text].  People v. Stills (1994) 29 Cal.App.4th 1766, 1770; People v. Howard (1992) 1 Cal.4th 1132, 1180; People v. Mosby (2004) 33 Cal.4th 353, 359, and People v. Christian (2005) 125 Cal.App.4th 688, 691, all involved the admission of a prior felony and whether the defendant was sufficiently aware of his constitutional rights.

[17]  [Fn. 18 in original excerpted text].  The Memro court reversed the defendant's conviction because "the trial court erred in summarily denying [defendant's] discovery motion." (Memro, supra, 38 Cal.3d at p. 665.) Even though the court had already determined that reversal was required on another ground, it addressed the issue of failure to obtain a separate waiver of jury on the trial of the special circumstance allegation "[b]ecause this issue is an important one likely to arise not only on retrial in this case but in many cases. . . ." (Id. at p. 700.)

13

murdered Zarate, no reasonable trier of fact could have failed to find that the murder occurred in the commission of a robbery. (See People v. Simpson (1991) 2 Cal.App.4th 228, 236–237 [concluding the even if there had been error in failing to obtain a separate waiver to a trial by jury on a special circumstance allegation, that error was harmless because of overwhelming evidence supporting the special circumstance allegation].)

Belardo, 2013 WL 5845121, *6-8.

### D. Objective Reasonableness Under § 2254(d)

As mentioned above, petitioner contends that the record does not contain a knowing and intelligent waiver of the right to a jury determination of the special circumstance allegation that the murder of Zarate took place during commission of a robbery. ECF No. 1 at 14. Without such a waiver, he argues, the finding on the special circumstance must be reversed and his sentence adjusted to life in prison with the possibility of parole. Id.

Respondent, citing McMillan v. Pennsylvania, 477 U.S. 79, 82 (1986), argues that relying on judicially-found facts to impose a greater mandatory minimum sentence does not implicate the Sixth Amendment. This position is inconsistent, however, with the Supreme Court's decision in Alleyne, supra. 133 S. Ct. at 2155. In Alleyne, the Supreme Court noted that Apprendi "prompted questions about the continuing vitality, if not validity of McMillan's holding that facts found to increase the mandatory minimum sentence are sentencing factors and not elements of the crime." Id. at 2157. The Alleyne decision went on to hold that "there is no basis in principle or logic to distinguish facts that raise the maximum from those that increase the minimum [sentence]." Id. at 2163.

The state court denied the claim on harmless error grounds. Accordingly, this court turns to the question of whether the failure to present the relevant issue to the jury – whether the murder occurred during the commission of a robbery – was harmless error. See Washington v. Recuenco, 548 U.S. 212, 222 (2006) (holding that Blakely/Apprendi errors are subject to harmless error analysis). In conducting a harmless error analysis on an Apprendi claim, relief is appropriate only if the Court is "in 'grave doubt' as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt." Butler v. Curry, 528 F.3d 624, 648 (9th Cir. 2008). As noted above, the court of appeal found that "no reasonable trier of fact could have

14

failed to find that the murder occurred in the commission of a robbery." <u>Belardo</u>, 2013 WL

5845121 at *8. This finding is supported by the evidence presented at trial. An eye witness to the

crime testified that the victim was directed to "[g]ive us the money, the jewelry, and the dope." 1

RT at 162.[18] That witness also testified that his wallet was taken and that, prior to being shot, the

victim stated "I ain't giving nothing up." <u>Id.</u> at 165. Additionally, the petitioner's then-girlfriend

testified that she overheard a phone conversation in which petitioner talked about the victim

selling drugs and the possibility of robbing him. 2 RT at 463. This witness also testified that she

spoke with petitioner after the shooting and he told her that he had gone to the victim's trailer to

rob him. <u>Id.</u> at 474. Based on the foregoing, the court is not in "grave doubt" as to whether the

jury would have found that the murder occurred in the commission of a robbery. This claim

accordingly should be denied.

II.     Claim Two: Admission of Testimony of Ellis and Bango

A.     <u>Petitioner's Allegations</u>

Petitioner claims that the trial court violated his due process right to a fair trial by

admitting the testimony of Ellis and Bango concerning pretrial statements petitioner made to them

that "showed his complicity in a robbery-gone-bad." ECF No. 1 at 21. Petitioner argues that

these witnesses' "identification of [petitioner] as an involved party was uncorroborated hearsay

provided by persons subject to prosecution for the identical offense." <u>Id.</u> Petitioner's argument is

that Ellis and Bango were accomplices and, therefore, their testimony could not be admitted

without corroboration, which, he also contends, was lacking. <u>See</u> <u>id.</u> at 22-32.

B.     <u>The Clearly Established Federal Law</u>

The Supreme Court has never considered the specific question whether the U.S.

Constitution requires the corroboration of accomplice hearsay. To the extent petitioner's due

process claim is predicated on an alleged violation of California law, errors of state law do not

present constitutional claims cognizable in habeas. <u>See</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984).

The erroneous admission of evidence only violates due process if the evidence is so irrelevant and

---

[18] "RT" refers to the Reporter's Transcript on Appeal, lodged with this court.

1  prejudicial that it renders the trial as a whole fundamentally unfair.  Estelle v. McGuire, 502 U.S.

2  62 (1991).

3       To the extent petitioner contends that California law itself violates due process, a state's

4  criminal law (such as state evidentiary rules pertaining to criminal trials) does not violate the Due

5  Process Clause "unless it offends some principle of justice so rooted in the traditions and

6  conscience of our people as to be ranked as fundamental."  Montana v. Egelhoff, 518 U.S. 37

7  (1996).  "It is not the State which bears the burden of demonstrating that its rule is deeply rooted,

8  but rather respondent who must show that the principle of procedure violated by the rule (and

9  allegedly required by due process) is so rooted in the traditions and conscience of our people as to

10  be ranked as fundamental."  Id. at 47 (quoting Patterson v. New York, 432 U.S. 197, 202 (1977))

11  (emphasis in original and internal quotation marks omitted) (rule that intoxication may be

12  considered on the question of intent was not so deeply rooted as to be a fundamental principle

13  enshrined by the Fourteenth Amendment).  A rule or practice must be a matter of "fundamental

14  fairness" before it may be said to be of constitutional magnitude.  Dowling v. United States, 493

15  U.S. 342, 352 (1990)).

16            C.  The State Court's Ruling

17       In rejecting this claim, the state appellate court gave the following background and

18  determined that Ellis's and Bango's testimony was properly admitted under state law because

19  these witnesses were not accomplices, and therefore the state corroboration rule, California Penal

20  Code § 1111, did not apply:

21            Section 1111 provides: "A conviction cannot be had upon the
            testimony of an accomplice unless it be corroborated by such other
22            evidence as shall tend to connect the defendant with the
            commission of the offense; and the corroboration is not sufficient if
23            it merely shows the commission of the offense or the circumstances
            thereof.  [¶]  An accomplice is hereby defined as one who is liable
24            to prosecution for the identical offense charged against the
            defendant on trial in the cause in which the testimony of the
25            accomplice is given."

26

27            **A.** *Bango*
            Belardo argues that Bango was liable to prosecution for the murder
28            of Zarate for three reasons: (1) Bango briefly held Belardo's gun at
            Moore's party several hours earlier, which Belardo characterizes as

16

a "convenient excuse for fingerprints, should any materialize"; (2) Bango had a dark enough complexion to be considered one of the two African-American robbers; and (3) Bango testified to an encounter with Delatorre after the shooting, contradicting the testimony of other witnesses, which Belardo characterizes as a fabrication to provide a reason why Delatorre might pick him from a lineup, should that eventuality arise. Belardo's characterization of the cited facts is rank speculation. To suggest that this amounts to probable cause to charge Bango with the murder of Zarate verges on frivolous argument.

**B. *Ellis***

Ellis testified about her participation in Belardo's drug sales. Belardo's argument concerning why Ellis could be charged with the murder of Zarate is not clear, but seems to be that the murder was a natural and probable consequence of Belardo's drug sales, to which Ellis was an admitted accomplice. We do not accept Belardo's suggestion that murder is a natural and probable consequence of dealing drugs. (See People v. Hinton (2006) 37 Cal. 4th 839, 880 ["[n]or do we accept defendant's suggestion that murder was a natural and probable consequence of any drug deal 'involving a large sum of money'"].)

Ellis might have been liable for prosecution as an accessory ([California Penal Code] § 32) to the murder of Zarate, because she threw Belardo's gun into Lake Berryessa, but not as a principal ([California Penal Code] § 31), so she was not liable to prosecution for the identical offense with which Belardo was charged. Accordingly, Belardo's contention that Ellis was an accomplice fails.

Because Bango and Ellis were not liable to prosecution for the murder of Zarate, section 1111 does not apply and their testimony did not require corroboration. Thus, we need not reach the question of whether their testimony was, in fact, corroborated.[19]

Belardo, 2013 WL 5845121, at *8-9.

     D.  Objective Reasonableness Under § 2254(d)

As respondent correctly argues, California Penal Code §1111, which requires corroboration of accomplice testimony, is a state law requirement that is "not required by the Constitution or federal law." Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000); see also United States v. Augenblick, 393 U.S. 348, 352-54 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional

---

[19] [Fn. 19 in original excerpted text]. We note that even if, contrary to our determination, Ellis were an accomplice, her testimony was corroborated by Bango, and the additional evidence discussed in part III of this opinion placing Belardo at or near the scene of the crime before and after it.

restrictions"); Harrington v. Nix, 983 F.2d 872, 874 (8th Cir. 1993) (holding that "state laws requiring corroboration do not implicate constitutional concerns that can be addressed on habeas review."). In the absence of controlling U.S. Supreme Court precedent, there can be no unreasonable application of clearly established federal law. Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam).

The court has also considered the principle that "[a] State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement." Laboa, 224 F.3d at 979. Here, the court of appeal interpreted state law and concluded that section 1111 did not apply to either Bango or Ellis and that their testimony did not require corroboration. Belardo, 2013 WL 5845121, at *9. This finding of state law is binding on this court. See Hicks v. Feiock, 485 U.S. 624, 629-630 (1988).

For both these reasons, this claim should be denied.

III.     Claim Three: Brady Claim and Related Denial of Motions for Mistrial

        A.  Petitioner's Allegations and Pertinent Record

Petitioner contends that material exculpatory evidence was not provided to him before trial, depriving him of due process under Brady v. Maryland, 373 U.S. 83 (1963). ECF No. 1 at 33. Petitioner further argues the trial court erroneously denied his motions for a mistrial based on his Brady claim. Id. at 69.

The state appellate court summarized the facts relevant to this claim as follows:

> After Belardo began to present his defense, it came to light that the defense had not been provided with three reports, from the 1998 investigation of the Zarate homicide, that Belardo contends were material to his defense. The issues raised do not require us to examine why these reports were not turned over before trial, so we review here only their content.
>
> The first report summarized an interview with Zarate's former girlfriend, identified as Donna Sanders.[20] Sanders told police that on February 13, 1998, David Castaneda, with two associates, came to Zarate's trailer and argued with him about a camera he had accepted in exchange for methamphetamine. During the argument,

---

[20]  [Fn. 20 in original excerpted text]. After the trial, defense investigator discovered, after the trial, that the police actually interviewed Danyielle Sanders, who was Zarate's former girlfriend, and not Donna, her sister.

Sanders heard Castaneda tell Zarate, "I'll just kill you."[21] Sanders said she knew the Castaneda family to be violent and the threat made her concerned for Zarate's safety. Although Sanders knew that Castaneda had been arrested the day before Zarate was shot, she believed that the family was responsible for the killing. Sanders believed that Castaneda's brother, Monce Castaneda (Monce), was "capable of this type of crime" and that he was "hanging out" in Vacaville with an African-American male, about 30 years old, with a stocky build, and six feet tall. Sanders thought that Monce was "taking care of business for his brother . . . when he attacked and shot [Zarate]."

The second report concerned Lewis Thomas. The investigator was attempting to identify the African-American male reported to be associating with Monce. Thomas was African-American and had been arrested with Monce in 1993. According to the report, a photo lineup that included Thomas's photograph was shown to Delatorre. Delatorre indicated that photo number three (not Thomas) "looked very familiar" and then pointed to Thomas's photo and said it "looks familiar."

Following the photo lineup, the investigator interviewed Thomas.[22] Thomas said that on the night Zarate was killed, he was at home with his wife and children, and that he had not seen Monce or been in Solano County since 1993. He said he was willing to take a computer voice stress analysis (CVSA) examination to prove his innocence. The exam results indicated no deception when Thomas denied being involved in the shooting. When the investigator told Thomas that a pair of pants with a red stain on them was found in his house, Thomas said the stains were from a red marker. He suggested the investigator could have the pants tested.

The third report was of a police interview with Monce, who denied involvement in the Zarate homicide and said he was with friends in Watson on the night it occurred. Monce agreed to a CVSA examination and the investigator "ran two charts." Review of the second chart indicated deception on two of the relevant questions. Monce said he might be showing stress because "he has been out in the street and he has heard that people are saying he was involved in the shooting." Monce reiterated his denial of involvement and the investigator "opted to do a third chart." No deception was indicated and the investigator concluded that "all indicators reflect that he is being honest in this exam." Monce agreed to participate in a lineup if requested.

---

[21] [Fn. 21 in original excerpted text]. The defense was already aware that Castaneda had an argument with Zarate over a camera, because Delatorre had mentioned that fact in an interview with the police. A transcript of that interview was provided to Belardo. Delatorre did not, however, say that a death threat was made. Delatorre said that Castaneda wanted the camera back and he believed that Zarate had returned it.

[22] [Fn. 22 in original excerpted text]. Although the investigator's report had not previously been provided to Belardo, a transcript of the interview with Thomas had been provided.

Belardo, 2013 WL 5845121, at *10-11.

The investigation in connection with David Castaneda was dropped after it was determined that he had been arrested on February 14, 1998 (the day before the February 15, 1998 murder) for drug possession and a probation violation, and he was in custody until arraignment on February 18, 1998. 2 CT 500-501, Abrams Decl. ¶ 17.

On May 3, 2011, defense counsel, Dawn Polvorosa, Esq., filed a motion to dismiss based on a discovery violation. 3 RT 785. Defense counsel argued that the failure to provide the reports and documentation was a discovery violation and a violation of due process under Brady. 3 RT 727-728, 778-779, 788-789, 855-860. The prosecutor, Krishna Abrams, Esq., responded that there was no bad faith on the part of the district attorney's office or the Dixon Police Department. 3 RT 860-863. Abrams argued, "No one was trying to hide anything, and . . . I was very upset on Friday when I learned there [were] additional reports, because I had, as the investigators testified, numerous times said, 'Does she [defense counsel] have everything? Did I have everything?' And I was assured that we did . . . . [I]t's unfortunate that there were reports that somehow . . . went into the working file and that they didn't get scanned and bait-stamped [sic], but they were produced as soon as I became aware of them." 3 RT 862.

Abrams argued that much of the content of the missing investigation reports was "not Brady material." 3 RT 861. Abrams also pointed out that the defense counsel had information about David Castaneda because she cross-examined Delatorre on this matter at the preliminary hearing. 3 RT 861. The prosecutor argued that although defense counsel did not receive the report by former investigator Lou Kalish (who worked at the Solano County District Attorney's Office from 1990 to 1998, 3 RT 853) regarding the interview with Lewis Thomas, the transcript of that interview was provided in pretrial discovery. 3 RT 862. Finally, the prosecutor argued that dismissal was inappropriate in this situation because there was no bad faith and a continuance would allow defense counsel to conduct further investigation should she desire to do so. 3 RT 862-863.

Defense counsel acknowledged that she received a copy of the Kalish interview with Lewis Thomas, but argued that the defense was not advised that Delatorre told the police that

Thomas's photograph looked familiar. 3 RT 863. Defense counsel noted that the information she received regarding David Castaneda did not relate to his threat to kill Zarate and counsel asserted that Castanedas were a "clan family that were involved in all kinds of criminal enterprises in Dixon." 3 RT 863-864. Finally, defense counsel argued that even if the discovery violation was the result of "mere[] negligence," based on "the length of time that has passed," petitioner was prejudiced by the failure to provide the reports in a timely manner. 3 RT 864.

The trial court denied the motion to dismiss, finding there was no bad faith on the part of the prosecution and that most of the information in the missing reports was disclosed in other discovery documents provided to the defense. The judge explained his ruling as follows:

> The question is whether or not the People acted in bad faith negligently or took some action to purposefully keep the defense from information.
>
> The record-keeping systems of the Dixon Police Department and the District Attorney's Office at the time, and even presently, did not appear to work together.
>
> That has been shown time and again by the fact that documents were brought forth just last week, and now were still coming perhaps today, but I don't find any of that was done in bad faith.
>
> As the District Attorney points out, just the opposite has been shown to me because not only did a search, um, was a search undertaken, but documents that weren't even referred to at the hearing last week were brought forth.
>
> But the question in my mind is whether—how material is all this new or discovered evidence?
>
> Because most in comparing exhibits that were submitted to me by the defense and the exhibits submitted to me by the People, when you start cross-referencing them back and forth, most of the information has been or was disclosed in other documents.
>
> I don't find anything new and startling in any of this information, and that goes to the next key: Was the defense prevented from investigating or presenting witnesses to show the Court exculpatory evidence involving this defendant?
>
> I don't find any of that to be found in the record has been pointed out. The remedies for this bench trial would be dismissal of the charges. I don't find that warranted, so I'm going to deny the motion.

3 RT 865-866.

On May 5, 2011 the trial court granted the defense request for a continuance to review discovery and determine whether to conduct additional investigation. 3 RT 895. The trial court stated as follows:

> . . . I don't think there has been a willful [with]holding of evidence.
>
> There certainly has been evidence that has been discovered as we go through the course of this trial, um, which causes the defense the necessity of checking it out and verifying it and seeing whether or not there's any validity to it, and the request for a continuance is not unreasonable under those circumstances.

3 RT 900 (brackets added).

As explained above, petitioner argues that the "[l]ack of disclosure of a significant portion of the 1998 Zarate murder investigation, including particularly material evidence favorable to the accused, deprived [him] of a fair trial under our adversarial system." ECF No. 1 at 33 (citing Brady v. Maryland, 373 U.S. 83 (1963)). Petitioner also argues the trial court erroneously denied his motions for a mistrial based on his Brady claim. Id. at 69.

### B. The Clearly Established Federal Law

In Brady v. Maryland, 373 U.S. 83 (1963), the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The U.S. Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).

Evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the . . . proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-70 (2009). In sum, for a Brady claim to succeed, petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). Banks v. Dretke, 540 U.S. 668,

22

691 (2004); <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

C. <u>The State Court's Ruling</u>

The state appellate court rejected both of petitioner's <u>Brady</u> claims, finding the information which defense counsel argued was not produced in a timely manner was not material, stating as follows:

> The essence of Belardo's argument is that the late production of documents relating to the investigation of the Castanedas in 1998 prevented him from mounting a viable defense of third-party culpability, depriving him of a fair trial. As he puts it: "[T]he error in the instant case cannot be shown harmless beyond [a] reasonable doubt . . . . Thomas presented a far more viable candidate as Zarate's murderer having been identified as 'looks familiar' by Delatorre in a photographic lineup. The motive provided by a used-camera-for-methamphetamine deal gone [bad] compared favorably with that of a crime-of-opportunity robbery selecting a low-budget methamphetamine dealer. Indeed, post-trial investigation would reveal that Danyielle Sanders, misnamed 'Donna' Sanders in the late-disclosed police reports, was available to testify that she was Zarate's girlfriend in 1998 and witnessed the death threat by David Castaneda . . . . The third-party-culpability evidence as to the Castaneda family threat compared favorably with that produced against appellant at trial. It certainly raises a doubt as to who is the actual responsible [sic] for shooting Zarate."

> We disagree. The statement by Delatorre that a photograph of Thomas looked familiar, does not link Thomas to the shooting of Zarate. Stating that a person "looks familiar" is far different from stating "this person looks like the person who shot Zarate." Similarly, there is no information in the reports of interviews with Thomas and Monce that would link them either directly or circumstantially to the Zarate homicide. The death threat by Castaneda might indicate motive for him to kill Zarate, but does not supply information linking Castaneda, or his family, to the homicide.

> Belardo's theory of third-party culpability, based on the late-produced reports from the People, is purely speculative. The information in these reports does nothing to diminish the credibility of Bango or Ellis, who provided independent accounts of Belardo's statements admitting his participation in the Zarate homicide. Nothing here undermines our confidence in the outcome reached by the trial court. Thus, the late-produced information was not material and no <u>Brady</u> violation occurred.

> Belardo also challenges the trial court's failure to grant its motion for a mistrial based on the late-produced reports from the 1998 investigation. Because these reports were not material to Belardo's defense, he was not prejudiced by the late production, and there is no reason for us to reexamine the trial court's denial of a mistrial.

23

Belardo, 2013 WL 5845121, at *12.

### D. Objective Reasonableness Under § 2254(d)

Petitioner's Brady claim fails for two reasons. First, the record amply supports the state court's finding that most of the information contained in the missing reports was contained in discovery which was provided. Because the defense knew about the Castaneda family's dispute with the victim, the defense had reason to investigate third-party guilt even in the absence of any withheld information. See Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006) (no Brady violation "where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence," even if the government failed to bring the evidence to the attention of the defense); United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) ("'[T]he Brady rule does not apply if the evidence in question is available to the defendant from other sources.'") As defense counsel had the essential facts enabling her to take advantage of this evidence, no Brady violation occurred. See id.

Second, prejudice has not been shown. The state court's conclusion that the late discovery matter could be remedied by a continuance is supported by the record. Specifically, although defense counsel may not have initially known about the alleged death threats made by David Castaneda, there was no prejudice because the trial court granted defense counsel's request for a continuance to meet this evidence. For the same reasons, there was no prejudice based on the late production of information that Delatorre said Thomas "looked familiar." Petitioner conflates the issue of preaccusation delay with that of discovery violation. The discovery violation involved the failure to provide the reports in a timely manner prior to trial. The prosecution was not obligated to provide petitioner with discovery information ten years earlier, before the case was filed. The record does not show that the untimely production of the documents after court-ordered discovery resulted in the loss of any exculpatory evidence. See United States v. Span, 970 F.2d 573, 583 (9th Cir. 1992) (explaining late disclosure of allegedly material evidence is not prejudicial so long as it occurs "'at a time when disclosure would be of value to the accused'"); see also United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983) ("No denial of due process occurs if Brady material is disclosed to [defendant] in time for its effective

use at trial.")

In addition, the state appellate court reasonably concluded that the late disclosure was not material. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. There has been no such showing. As the state appellate court correctly held, petitioner's theory of third-party culpability was speculative. Accordingly, the state court's denial of petitioner's Brady claim did not involve an unreasonable application of Supreme Court authority.

Petitioner's claim that the trial court erroneously denied his motions for a mistrial, based on the Brady violation, should also be denied. That claim relies on the same meritless arguments offered in support of the Brady claim, and is similarly barred by § 2254(d)(1).

IV.     Claim Four: Delay in Prosecution

A. Petitioner's Allegations and Pertinent Record

Having been brought to trial in 2011 for a crime that occurred in 1998, petitioner contends that he was prejudiced by the delay in prosecution, and that the prejudice was aggravated by the delay in disclosure of information related to the investigation of potential involvement in the crime by the Castaneda family, as discussed above. ECF No. 1 at 59.

On August 17, 2010, defense counsel moved to dismiss the information based on preaccusation delay. 1 CT 204 -226. Specifically, the defense moved to dismiss on the grounds that during the ten-year delay in bringing charges, the "investigating officers investigating the case acted in bad faith [by] failing to collect and preserve evidence, violating [Petitioner's] right to due process." 1 CT 204-205. In opposing the motion, the prosecutor stated that there was "no evidence to support [petitioner's] accusations that law enforcement has lied, concealed, destroyed, or withheld evidence from the defendant." 1 CT 268-269.

On August 31, 2010, the trial court heard arguments relating to petitioner's motion to dismiss, and denied the motion. 1 RT 12.

On October 7, 2010, the defense again moved to dismiss for preaccusation delay, contending that investigating officers failed to collect and preserve evidence. 1 CT 299-300; 2

25

CT 301-330. Defense counsel further claimed that there was a "speedy trial violation due to the prosecution's failure to timely disclose material and exculpatory evidence which has prejudiced [petitioner's] case." 2 CT 300. In opposing this motion, the prosecution argued that the defense had previously brought this "identical motion" before the trial court, and that it had been denied on August 31, 2010. 2 CT 333.

On November 9, 2010, the trial court conducted a hearing on the second motion to dismiss the information. 1 RT 19-48. The trial court denied the motion after argument from both parties, stating as follows: "You have both made a record. I don't find the motion to dismiss to be persuasive, so I'll deny it." 1 RT 44.

On May 3, 2011, after the parties learned that certain reports and documentation had not been turned over to the defense, petitioner again moved to dismiss and for a mistrial. 2 CT 449. The next day, on May 4, 2011, the trial court acknowledged that that the motion had been filed, and asked the parties to elaborate on why the reports and documentation had not been produced in discovery. 3 RT 785-799. The trial court further stated: "I just need to know how these so-called miracles are happening when we're almost finished with trial, to determine whether or not [the prosecutor] made a willful withholding of evidence, or it's just, as I said earlier, sloppy police work." 3 RT 793. The trial court directed the prosecutor to respond to the defense motion, and to include declarations from the investigators and to make them be "available for examination, should that become necessary." 3 RT 798.

On May 5, 2011, at the hearing on the motion to dismiss, the trial court noted that the prosecutor had submitted a pleading entitled, "The response of affidavits regarding discovery." 3 RT 800. The trial court conducted an evidentiary hearing, and heard testimony from various declarants including Investigators Jose Cuevas and Ronald Becker, Sergeant Elaine Perry, former investigator Kalish, and the prosecutor (Abrams). CT 565; 3 RT 801-855. In support of the motion, defense counsel argued, "The prosecution has not justified [the preaccusation] delay, has not brought forth any information to this Court that indicates that there was something that they received between 1998 and 2008 when he was charged that would justify Mr. Belardo being charged ten years after that date." 3 RT 859. Defense counsel argued that in addition "to the

speedy trial issue" there was a violation of due process because "Brady material has been

withheld from the defense." 3 RT 860. In response, the prosecutor argued that "there has been

no Brady violation, and . . . the dismissal of a case is such a drastic remedy and it should only be

used if there's a violation of the constitution and upon a finding of bad faith." 3 RT 862. The

prosecutor added: "There was no bad faith on behalf of anybody involved in this case in law

enforcement, or the DA's office, and that's not the proper remedy." 3 RT 863. Finally, the

prosecutor alleged that she "immediately disclosed" the new reports and documents "when [she]

became aware of [them.]" Id. The prosecutor also suggested that defense counsel could request a

"continuance," but that there was nothing to support the argument that the case should be

dismissed. Id.

In denying the motion, the trial court stated as follows:

> The question is whether or not the People acted in bad faith
> negligently or took some action to purposefully keep the defense
> from information.

> The record-keeping systems of the Dixon Police Department and
> the District Attorney's Office at the time, and even presently, did
> not appear to work together.

> That has been shown time and again by the fact that documents
> were brought forth just last week, and now were still coming
> perhaps today, but I don't find any of that was done in bad faith.

> As the District Attorney points out, just the opposite has been
> shown to me because not only did a search, um, was a search
> undertaken, but documents that weren't even referred to at the
> hearing last week were brought forth.

> But the question in my mind is whether—how material is all this
> new or discovered evidence?

> Because most in comparing exhibits that were submitted to me by
> the defense and the exhibits submitted to me by the People, when
> you start cross-referencing them back and forth, most of the
> information has been or was disclosed in other documents.

> I don't find anything new and startling in any of this information,
> and that goes to the next key: Was the defense prevented from
> investigating or presenting witnesses to show the Court exculpatory
> evidence involving this defendant?

> I don't find any of that to be found in the record has been pointed
> out. The remedies for this bench trial would be dismissal of the

charges. I don't find that warranted, so I'm going to deny the motion.

The Court will be able to take into consideration the presentation of evidence in weighing its value when it comes time for the decision-making time, and whether or not the evidence that was late in coming did cause the defense any . . . inability or did it hamper the defense in presenting what the defense wanted to have the Court know about the case.

So the motion is denied.

3 RT 865-866.

When the matter was renewed on May 11, 2011, defense counsel referred to the preaccusation delay only in passing during the extensive arguments at the hearing on the motion to dismiss. 4 RT 925-928. Specifically, defense counsel stated as follows:

. . . the defense again is in this position of coming to the Court to ask for relief for what has really been a failure on the part of the prosecution to ensure a fair trial for Mr. Belardo. ¶ This information was available in 1998. There is nothing that . . . would have prevented them from prosecuting him at an earlier stage, based on the information that they had. ¶ If that has been done in a timely manner, then the defense would have had the opportunity to properly investigate this case, to properly follow-up on leads.

4 RT 925. The prosecutor again opposed the motion. 4 RT 928-934. The trial court then denied the renewed motion upon finding that "nothing is shown that the evidence before the Court has been in any way tainted or subject to manipulation or that any undiscovered speculative evidence would change the evidence that's come in to the Court here." 4 RT 939-940. The trial court added that that they were "dealing with a thousand pages of reports, and [the court] can't explain what the system as the Dixon Police Department was for retaining, maintaining evidence," but that while the system was "questionable," it "does not rise to the basis of dismissing these charges . . . ." 4 RT 940.

After the trial court's ruling, defense counsel renewed the motion for mistrial, stating: "[. . .] had this information been known, had the extent of the withholding been known, that's something that we would have used in front of a jury, as opposed to waiving [the right to a] jury in this particular case." 4 RT 940. The trial court denied the motion for mistrial stating: "[t]he defense's motion for mistrial with prejudice is the same motion as the motion for dismissal,

28

1   which the Court just heard and heard previously, on the exact same grounds as the motion for

2   dismissal, and so the ruling is the same." 4 RT 942.

3                      B.   The Clearly Established Federal Law

4        The Due Process Clause prohibits undue delay between the commission of an offense and

5   the initiation of prosecution only if it renders the trial unfair. United States v. Lovasco, 431 U.S.

6   783, 796 (1977).[23] Because of statutory safeguards in the form of statutes of limitation, "the Due

7   Process Clause has a limited role to play in protecting against oppressive delay." Id. at 789. In

8   determining whether a constitutional violation occurred, "the due process inquiry must consider

9   the reasons for the delay as well as the prejudice to the accused." Id. at 790. Accordingly, "to

10  prosecute a defendant following investigative delay does not deprive him of due process, even if

11  his defense might have been somewhat prejudiced by the lapse of time." Id. at 796.

12       Due process requires dismissal of the indictment, or the information, if it is shown that the

13  preaccusation delay caused substantial prejudice to the defendant's right to a fair trial and that the

14  delay was "an intentional device to gain tactical advantage over the [defendant]." United States

15  v. Marion, 404 U.S. 307, 324 (1971). Balancing the sound administration of justice with the right

16  of the defendant to a fair trial necessarily involves a delicate judgment based on the circumstances

17  of each case. Id. at 326.

18                      C.   The State Court's Ruling

19       After petitioner raised his preaccusation delay claim on direct appeal, the state appellate

20  court rejected the claim:

21              "Delay in prosecution that occurs before the accused is arrested or
                the complaint is filed may constitute a denial of the right to a fair
22              trial and to due process of law under the state and federal
                Constitutions. A defendant seeking to dismiss a charge on this
23

24  _____

    [23] Once a person becomes "accused," the more stringent requirements of the Sixth Amendment
25  speedy trial right apply. One becomes "accused" when there is "either a formal indictment or
    information or else the actual restraints imposed by arrest and holding to answer a criminal
26  charge." United States v. Marion, 404 U.S. 307, 320 (1971). At this stage, although standards
    are still imprecise, the courts have been more willing to find delay to be constitutionally
27  impermissible. See, e.g., Doggett v. United States, 505 U.S. 647, 648-58 (1992) (finding that
    eight-and-a-half year delay between formal indictment and arrest and trial violated Sixth
28  Amendment right to speedy trial).

ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." The prosecution's investigator admitted that "[t]he maintenance of the files have been kept in less than adequate order, as well as the order in which they were maintained within the binders, interviews by each of the investigators involved should have been kept in order of date and the person(s) conducting the interview. Unfortunately they were not." While the information turned over to the defense may have been disorganized and, as already discussed, not produced for the defense in a timely manner, Belardo does not explain how this prejudiced his case and rendered his trial unfair. We have already determined that the late-produced investigation reports were not material and the defense was not prejudiced by the late production. While the defense may have had difficulty constructing "an accurate review of the investigation," Belardo does not argue that the defense was unable to do so or explain how a better understanding of the police investigation would have affected the outcome of the trial to his advantage.

Belardo next cites the problem that "[p]hysical evidence that had been collected was no longer available for testing." This evidence, once in the possession of the police but not available at trial, includes a bicycle found in a vacant lot near the crime scene; a small backpack; and Delatorre's composite drawing of the shooter.

The police seized the bicycle on the night of the murder because it was in a vacant lot near the crime scene and a neighbor did not recognize it. The officer who collected it thought it had been there for some time because it was covered with dew. The police department disposed of the bicycle sometime between 1998 and Belardo's trial. The police also collected the backpack that night, but no information about it, beyond the fact of its collection and its description, is in the record.

Belardo observes that neither the bicycle nor the backpack were tested for gunshot residue, fingerprints, or DNA evidence and that, because they are now missing, they cannot be tested now. However, nothing in the record links the bicycle or the backpack to the shooting of Zarate, so any significance they might have is speculative. Belardo has failed to show that the absence of the bicycle or the backpack was prejudicial to him.

The composite drawing might have been useful to Belardo in challenging the credibility of Delatorre's identification of Belardo, but it would only have been cumulative because no trier of fact could have given much weight to that identification. The defense was able to clearly establish that Delatorre had examined multiple photographic lineups that included Belardo and had failed to identify Belardo as the shooter. Delatorre also was unable to identify Belardo as the shooter at a live lineup. By the time Delatorre provided his less than certain identifications of Belardo at the conditional hearing (where Belardo appeared in prison garb) and at trial, he had seen Belardo or his images multiple times.

Because the defense was able, without the composite drawing, to effectively compromise Delatorre's identification, the lack of the drawing was not prejudicial.

Belardo also argues that some of the photographic lineups shown to Delatorre had been lost and that the investigators' recollections about the lineups were "rather faded." Any missing material or faded memories concerning the photographic lineups could only have served to impeach Delatorre's identification of Belardo and, like the missing composite drawing, would only have been cumulative.

The missing bicycle and backpack, the lost composite drawing, and any missing information about photographic lineups had nothing to do with Ellis's and Bango's testimony concerning Belardo's admissions and threats, and could not have served to cast doubt on the prosecution's primary evidence against him.

We conclude that Belardo has failed to demonstrate prejudice from the delay in prosecution and we need not proceed to examine justification for the delay.

Belardo, 2013 WL 5845121, at *12-13.

### D. Objective Reasonableness Under § 2254(d)

The state court's denial of the claim for lack of prejudice involved neither an unreasonable application of clearly established law nor unreasonable factual findings. Petitioner identifies no specific evidence lost due to the delay, loss of which rendered his trial unfair. As the California Court of Appeal noted, petitioner's reliance on the absence of certain physical evidence for forensic testing amounts to speculation about the results. None of the missing evidence is sufficiently linked to issues of guilt or innocence to have made any likely difference to the outcome. Because petitioner's prejudice showing is purely speculative, it does not satisfy the "actual prejudice" standard for a due process violation. See Lovasco, 431 U.S. at 789; see also United States v. Ross, 123 F.3d 1181, 1185 (9th Cir. 1997) (defendant must show prejudice from pre-accusation delay that is "definite and not speculative"); United States v. Mays, 549 F.2d at 677 n.12 (9th Cir. 1977) (speculation that a witness or item of evidence that is no longer available "might have been useful" does not suffice).

Accordingly, petitioner's claim of a due process violation based on pre-accusation delay should be denied.

////

31

V.      Claim Five: Waiver of Trial by Jury on Issue of Guilt

A.      Petitioner's Allegations

Petitioner contends that the late-produced reports from the 1998 investigation, discussed above, worked to render his waiver of a trial by jury on the issue of guilt neither knowing nor intelligent.  ECF No. 1 at 70.

B.      The Clearly Established Federal Law

The Sixth Amendment affords criminal defendants the right to trial by jury, and applies to state criminal trials through the Due Process Clause of the Fourteenth Amendment.  See Duncan v. Louisiana, 391 U.S. 145, 149 (1968).  The right to trial by jury may be waived as long as the waiver is intelligent and voluntary, and a conviction obtained after such a waiver is not constitutionally infirm.  See Patton v. United States, 281 U.S. 276, 312 (1930), modified on other grounds by Williams v. Florida, 399 U.S. 78 (1970).

"[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances—even though the defendant may not know the specific detailed consequences of invoking it.  A defendant, for example, may waive his right to remain silent, his right to a jury trial, or his right to counsel even if the defendant does not know the specific questions the authorities intend to ask, who will likely serve on the jury, or the particular lawyer the State might otherwise provide."  United States v. Ruiz, 536 U.S. 622, 629-30 (2002).

C.  The State Court's Ruling

The court of appeal rejected this claim as follows:

> "To be valid, a defendant's waiver of the right to a jury must also be 'knowing and intelligent, that is, 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,' as well as voluntary 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'  (Weaver, supra, 53 Cal. 4th at pp. 1071-1072, quoting People v. Collins (2001) 26 Cal. 4th 297, 305.)
>
> Belardo appears to believe that a waiver, made knowingly and intelligently, might later be rendered unknowing or unintelligent because some facts about the case, not contemplated at the time of the waver, come to light.  He is wrong.  "[T]he law ordinarily

considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances—even though the defendant may not know the specific detailed consequences of invoking it."  (United States v. Ruiz (2002) 536 U.S. 622, 629.) The late-produced discovery had no bearing on Belardo's prior understanding of the nature of the right to a jury trial and how waiving that right would apply in general.

Belardo, 2013 WL 5845121, *13-14.

### D.  Objective Reasonableness Under § 2254(d)

As explained above in Section III, the record does not support petitioner's underlying premise that the defense was denied significant material information about this case prior to the jury waiver.  The defense knew about the alleged involvement of the Castaneda family, because defense counsel was given access to the transcript of the interview with Lewis Thomas during pretrial discovery.  See 3 RT 862.  The defense also knew about the dispute between David Castaneda and Zarate over a bad drug deal, because counsel cross-examined Delatorre on this matter at the preliminary hearing.  See Resp't Ex. F, Preliminary Hearing Transcript at 52-54. During the pretrial hearing, defense counsel informed the trial court that there was a "potential" of pursuing a defense of third-party culpability.  1 RT 27-28, 33-36.

Furthermore, the loss of evidence and the problems investigating a case that was 13 years old were apparent at the time defense counsel brought up the matter of waiving a jury trial. Before defense counsel raised the question of a court trial, it had filed several motions to dismiss based on the prosecution's alleged failure to preserve exculpatory evidence and the destruction of such evidence.  1 CT 204-226, 299-300; 2 CT 301-330.  As mentioned above, the trial court subsequently stated it would consider the discovery violation in determining guilt, stating: "The Court will be able to take into consideration the presentation of evidence in weighing its value when it comes time for the decision-making time, and whether or not . . . it did hamper the defense in presenting what the defense wanted to have the Court know about the case."  3 RT 866.  Thus, defense counsel's later statement that the defense would have not sought a court trial had it known of the prosecution's failure to preserve evidence and/or discovery violation is contradicted by the record.

Additionally, the record supports the trial court's finding the discovery violation was inadvertent. Clearly, neither party contemplated the mistakes of Investigators Cuevas and Becker and of Sergeant Perry (which were not yet apparent) when counsel agreed to proceed with a court trial.

Accordingly, the state appellate court's determination that the jury waiver was voluntary was not an unreasonable application of Supreme Court authority. Therefore, this claim should be denied.

VI.     Claim Six: Denial of Motions for New Trial

A.      Petitioner's Allegations and Pertinent Record

Petitioner argues the trial court erroneously denied his motions for a new trial based on new evidence discovered after trial. ECF No. 1 at 73. The court of appeal offered the following background:

> On July 1, 2011, Belardo filed a motion for a new trial based, in part, on the ground that new evidence had been discovered that was material to his defense. The motion and supporting declaration by a defense investigator related that Danyielle Sanders had been located in prison and that she recalled the death threat made against Zarate, but that she was unwilling to make a declaration or testify, for fear of retaliation. According to the defense investigator, Sanders also said that "she was not sure if she was remembering David Castaneda as actually being present and making the threat against . . . Zarate because she had read the report to refresh her memory during my initial visit with her or because mentioning the Castaneda family name caused her to recall the past event."
>
> On July 12, 2011, Belardo filed a supplemental motion for a new trial, providing additional new evidence—a declaration by Tiffany Stevens. According to the declaration, Stevens was visited one evening in 1998 by her friend Monce (no last name provided), accompanied by an African-American man named David. Monce told her that they had just robbed and shot someone, and that David was responsible for the shooting.
>
> On August 18, 2011, after a hearing, the trial court denied the motion for a new trial, stating: "As to whether or not there is new evidence to support the defendant's motion, I think the only thing we knew, no new documents were filed with the court to raise further opportunities to speculate as to some third person or some other person who might be involved. None of it is compelling and would lead the court to believe any of these Castaneda people were involved in this particular violation."

Belardo, 2013 WL 5845121, at *14.

1

## B.    The Clearly Established Federal Law

2      Federal habeas relief is not available for errors of state law.  See Estelle v. McGuire, 502

3   U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court

4   determinations on state-law questions.")

5      The United States Constitution "makes no mention of new trials."  Herrera v. Collins, 506

6   U.S. 390, 408 (1993).  Accordingly, denial of a defendant's motion for new trial based on newly

7   discovered evidence cannot violate due process unless "it offends some principle of justice so

8   rooted in the traditions and conscience of our people as to be ranked as fundamental."  Id. at 407-

9   08.

10                   ## C.   The State Court's Ruling

11      The court of appeal rejected petitioner's claim as follows:

12
       Section 1181 provides the grounds upon which a court may grant a
13     new trial.  One of the listed grounds, section 1181, subdivision 8, is:
       "When new evidence is discovered material to the defendant, and
14     which he could not, with reasonable diligence, have discovered and
       produced at the trial.  When a motion for a new trial is made upon
15     the ground of newly discovered evidence, the defendant must
       produce at the hearing, in support thereof, the affidavits of the
16     witnesses by whom such evidence is expected to be given, and if
       time is required by the defendant to procure such affidavits, the
17     court may postpone the hearing of the motion for such length of
       time as, under all circumstances of the case, may seem reasonable."

18     In order to prevail on a motion for a new trial based on newly
       discovered evidence, a defendant must show the following: (1) the
19     evidence itself, and not simply its materiality, is newly discovered;
       (2) the evidence is not merely cumulative; (3) the new evidence
20     would make probable a different result on retrial; (4) the moving
       party could not, with reasonable diligence, have discovered and
21     produced the new evidence at the trial; and (5) these facts are
       demonstrated by the best evidence that the case admits.  (People v.
22     Dyer (1988) 45 Cal. 3d 26, 50-51.)

23     "'The determination of a motion for a new trial rests so completely
       within the court's discretion that its action will not be disturbed
24     unless a manifest and unmistakable abuse of discretion clearly
       appears.'"   (People v. Williams (1988) 45 Cal. 3d 1268, 1318,
25     abrogated on another ground in People v. Guiuan (1998) 18 Cal. 4th
       558, 560-561.)  However, when a significant constitutional issue is
26     implicated in a motion for a new trial and the trial court denies the
       motion, some courts apply a de novo standard of review.  (People v.
27     Albarran (2007) 149 Cal. App. 4th 214, 224, fn. 7.)

28     . . .

Belardo contends that he was entitled to a new trial because of the newly discovered evidence and that the trial court erred in denying him a new trial. He argues that we should engage in a de novo review because his motion for a new trial implicates issues of due process.

We review the denial of Belardo's motion for abuse of discretion because "the exclusion of weak and speculative evidence of third party culpability does not infringe on a defendant's constitutional rights." (People v. Gonzales (2012) 54 Cal. 4th 1234, 1261.)

In order to prevail in its motion for a new trial, Belardo had to demonstrate, among other things, that the new evidence would make probable a different result on retrial. There is no indication that the court failed to appreciate the content of the offer of new evidence or that it failed to weigh that offer against the evidence presented at trial. Indeed, the court found that the evidence against Belardo was "substantial and compelling": Bango, Ellis, and Delatorre, "as well as the other witnesses, all testified, and it appeared to the court they were truthful, although there were a number of contradictions in their presentation of the evidence and what they said 13 years before during interviews, some of which was not the same. But the main theme, and throughout the entire trial, was that [Belardo] is the one who committed the crimes."

Belardo, 2013 WL 5845121, *14-15.

### D. Objective Reasonableness Under § 2254(d)

The court of appeal rejected this claim on state law grounds that are not reviewable here. See Estelle, 502 U.S. at 68. The summary rejection of petitioner's incipient due process theory was not unreasonable, because there was no error of state law – let alone an error that rose to the level of a due process violation.

The defense had located Sanders on May 6, and information corroborating her report to Kalish on May 10, before the close of the evidentiary phase. If the defense needed more time to conduct follow up investigation or call Sanders to testify, it was clear that the court was willing to grant a further continuance. Indeed, as stated, one of the reasons the trial court denied the motion for a new trial was that it had granted continuances and told defense counsel it would give counsel time she needed to investigate.

For similar reasons, petitioner has failed to demonstrate that on retrial the new evidence would render a different result probable. The defense had information about the Castaneda family's conflict with Zarate before the commencement of trial. Additionally, Sanders was not

36

present the day of the shooting, and there is no indication that her testimony would reflect on the credibility of Bango or Ellis.  As the trial court found, there is no showing that Sander's testimony which was based largely on speculation and rumor would have had significant impact on the verdict.  As discussed above, prior to trial the defense had information relating to the law enforcement suspicion that Monce Castaneda might have been involved in the Zarate killing.  The trial court clearly found Ellis and Bango credible.  Finally, in light of the compelling evidence that petitioner committed the murder of Zarate, Stevens's statement – that Monce told her that an African American man named "David" had shot someone they had robbed "one night" in 1998 – would not likely have an impact on retrial.

Accordingly, the state appellate court's rejection of the new trial claim is not contrary to, or an unreasonable application of, clearly-established federal law.  See 28 U.S.C. § 2254(d)(1).  Therefore, this claim should be denied.

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Even without reference to AEDPA standards, petitioner has not established any violation of his constitutional rights.

The parties have not consented to magistrate judge jurisdiction and, accordingly, IT IS HEREBY ORDERED that the clerk of court shall assign a District Judge to this case.

Additionally, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In

his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  <u>See</u> 28 U.S.C. § 2253(c)(2).

DATED: July 11, 2017

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE